UNITED STATES of America, Appellee,

v.

Kenneth W. KAMINSKI, Appellant.

UNITED STATES of America, Appellee,

v.

Stephen E. MOUNT, Appellant.

UNITED STATES of America, Appellee,

v.

George P. FAHR, Appellant.

UNITED STATES of America, Appellee,

v.

John M. BROWNRIGG, Appellant.

UNITED STATES of America, Appellee,

v.

Douglas C. PAYNE, Appellant.

Nos. 81–1200 to 81–1204.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 8, 1982.

Decided July 29, 1982.

Rehearing and Rehearing En Banc
Denied Aug. 24, 1982.

Douglas W. Thomson Law Firm, Douglas W. Thomson and Robert D. Goodell, St. Paul, Minn., for Kaminski.

Jack S. Nordby, Minneapolis, Minn., for Mount, Fahr and Brownrigg.

Meshbesher, Singer & Spence, Ltd., Ronald I. Meshbesher, Carol Grant, Minneapolis, Minn., for Payne.

James M. Rosenbaum, U. S. Atty., Douglas A. Kelley, Asst. U. S. Atty., Minneapolis, Minn., for appellee.

Before HEANEY, McMILLIAN and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

Defendants Kenneth W. Kaminski, Stephen E. Mount, Douglas C. Payne, George P. Fahr, and John M. Brownrigg appeal from their various convictions on an indictment containing 14 counts of mail fraud and one count of conspiracy to commit mail fraud. See 18 U.S.C. §§ 1341, 371. The indictment alleged that from January of 1978 to September of 1979 the defendants conspired to defraud customers of Federal Gold and Silver, a precious-metals brokerage company, and that they committed acts of mail fraud in the process. All defendants were charged on all counts. The convictions appealed here were based on jury verdicts which came after some 30 days of trial spanning a period of three months.[1] All defendants were convicted on mail fraud charges, and Kaminski and Mount were convicted on the conspiracy charge.[2]

---

1. The lengthy jury trial was before the Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

2. No two defendants were convicted identically. Kaminski was convicted on six counts of mail fraud (III, VI, VII, VIII, IX, and XIII) and the one conspiracy count (XV), for which he received a term of ten years' imprisonment and a fine of $2,000. Mount was convicted on

All of the defendants have appealed their convictions and point out numerous grounds for reversal that deserve discussion.[3] As one might expect, there is considerable overlap in the arguments they present. All five defendants argue in some fashion that (1) there was insufficient evidence to sustain their convictions; (2) there were repeated instances of prosecutorial misconduct which denied them a fair trial; and (3) the District Court erred in not granting their motions for severance. In addition defendants Mount, Fahr, and Brownrigg claim that it was plain error for the District Court to allow an alternate juror to accompany the jury during its deliberations, and to be later substituted, despite the consent of all defendants. After full consideration of these arguments we conclude that, with three exceptions (count IX as to Kaminski and counts IV and XII as to Mount), the judgments of the District Court must be affirmed.

## I. Factual Background

### A. *The Operation of FGS: December 1976—September 1979*

The charges in this case grew out of the operation of an investment company called Federal Gold and Silver (FGS) located in Bloomington, Minnesota. What follows is a summary of the facts as the jury could have found them on this record, allowing for all reasonable inferences in support of the verdict. FGS was incorporated in December of 1976 by defendant Kaminski who ostensibly put up $5,000 of the initial capital to start the company. There were two other original investors in the company, a Mr. Ulrich, who invested $10,000, and a Mr. Swalinkavich, who contributed $5,000.[4] Soon after incorporation Kaminski hired Mount as an accountant. A bookkeeping entry dated February 4, 1977, showed an investment of $5,000 with the initials "SM" next to it. Presumably this entry reflects an investment by defendant Stephen Mount, though Ulrich and Swalinkavich thought Kaminski had invested the money. The day-to-day management of FGS was left to Kaminski by mutual agreement of the three investors. At no time did Ulrich or Swalinkavich take an active part.

FGS was patterned after Continental Coin Corporation, which operated in the Minneapolis area from 1973 to 1975. Several of the defendants, Kaminski, Mount, and

seven counts of mail fraud (III, IV, VI, VII, VIII, XII, XIII) and the one conspiracy count (XV), for which he received a like term of ten years' imprisonment and a $2,000 fine. The three other defendants were acquitted on the conspiracy count but were convicted and sentenced as follows on the mail fraud charges: (1) Payne guilty on ten counts of mail fraud (I, II, IV, V, VIII, IX, X, XI, XII, XIV) and sentenced to six years' imprisonment and a $2,000 fine; (2) Fahr guilty on nine counts of mail fraud (I, II, IV, V, IX, X, XI, XII, XIV) and sentenced to two years' imprisonment; and (3) Brownrigg guilty on six counts of mail fraud (I, II, V, IX, XI, XIV) and sentenced to one year's imprisonment. Five of the mail-fraud counts (III, VI, VII, VIII, XIII) charged as to Fahr and Brownrigg were dismissed prior to trial because the acts alleged therein predated their association with FGS. Richard Newham, another principal actor in the alleged scheme and a major witness for the government, pleaded guilty to two counts of mail fraud pursuant to a plea agreement. Newham was sentenced on the same day as the above defendants to eight years' imprisonment and a $2,000 fine.

3. The contentions listed in the text are not exhaustive. The defendants make many other arguments, all of which we hold to be without merit and not worthy of discussion. They include the following: that the District Court abused its discretion when it refused to strike evidence pertaining to a transaction involving FGS, International Coin, and House of Crowns; that the District Court erred in finding a foundation for the admission of out-of-court statements and acts of several persons not shown to be conspirators; that the District Court violated defendants' right to confrontation by improperly restricting cross-examination of certain prosecution witnesses; that it was error to refuse instructions offered by defendants on the theory of their defense; that it was error to receive over defendants' objections certain documents purporting to bear Fahr's and Brownrigg's signatures when there was no evidence as to their authenticity; and that Fahr and Brownrigg were prejudiced by improper references to their alleged alcoholism.

4. Ulrich and Swalinkavich were not named in the indictment. Ulrich sold his interest to defendant Mount in March of 1977 for $20,000, and Swalinkavich sold his interest for a like amount in February of 1979.

Payne, and a government witness, Newham, had all been employed by Continental Coin at one time or another. The principal mode of doing business at FGS involved the sale of gold and silver coins on "margin" or "leverage contracts." This manner of sale required the customer to pay only a portion (the minimum was 10%) of the total purchase price of a specified amount of gold or silver coins and to agree to pay the balance at some future date. The balance was financed by FGS at the rate of 8% per annum, and a 1% commission was charged on the total amount of the sale. Customers were told that if some time in the future they paid off the balance of their contract, they could either take actual delivery of the gold or silver, or receive the value of the metal in cash. The customer could also instruct FGS to liquidate his position in the market at any time and take either the profit or the loss on his transaction. A few customers chose to pay the full purchase price of their gold or silver coins and take immediate delivery, but these transactions were rare.

Buying on margin enabled a customer to control a larger amount of gold or silver than through a cash purchase. Thus, larger profits could be reaped, or larger losses incurred, depending on whether the price of gold or silver rose or fell. The lure of enormous profits was used as a strong selling point by FGS salespersons to encourage prospective customers to use the margin accounts.[5]

When the price of gold or silver rose significantly, a margin customer would acquire additional equity in his account. But if the price of gold or silver dropped, the customer would have to meet a "margin call," that is, he would have to put in additional money to make up for losses and keep the account margined at the minimum 10% level, as required by FGS. When the price of gold or silver was on the rise, FGS sales-men would encourage customers to reinvest their surplus equity. FGS tried to keep their customer accounts margined to the fullest extent in order to be in a position to make margin calls in the event of a sudden drop in prices.

For much of the first year (1977) business at FGS was not good. At this time Kaminski was acting as sales manager, and Mount was acting as President. In an effort to boost sales Kaminski contacted Newham in the fall of 1977 about coming to work at FGS after he was released from the hospital where he was undergoing treatment for alcoholism. Kaminski knew Newham from Continental Coin, and he respected his skills as a salesman. The matter was discussed again during November, and then, in December, when Kaminski acquired a company called National Commodities Exchange, Newham agreed to become the new sales manager of FGS.

Upon joining FGS Newham took steps to change the management of the company with the aim of improving the level of sales. In January of 1978, for example, Newham hired defendant Payne, a close friend, to serve as Director of Market Research. He also acquired more sumptuous office space, designed a fancy brochure about FGS, and placed advertisements in the *Wall Street Journal*. Newham, along with other FGS employees, also attended various seminars around the country in an effort to meet prospective investors.

Newham was known by many as extravagant. At the very least he believed in spending money to make money. Because of this trait, and partly because of a general personality conflict, Newham and Mount did not get along. Often they did not speak to one another, and when they did communicate, they usually did so through intermediaries like Payne and Kaminski. At this time, in 1978, Kaminski was spending most of his time at National Commodities, but he

---

**5.** For example, if gold was selling at $500 an ounce, one willing to invest $1,000 could buy only two ounces. On a margin contract, however, paying 10% down, a customer with $1,000 could contract for the purchase of $10,-000 worth of gold and thus control 20 ounces.

If the price of gold then rose $10, the cash customer's investment would increase in value by $20; the margin customer's investment, on the other hand, would increase in value by $200. Losses, of course, could be just as dramatic for the margin customer.

continued to take a part in the running of FGS (the two companies had offices in the same building) and, of course, he still owned a portion of FGS.

Payne, as we noted earlier, was serving as Director of Market Research. While at this post he wrote a daily newsletter containing market information that was available to all FGS sales personnel. He was also responsible for managing FGS's hedge account. A hedge account is a means of transferring the risk of customers' investments by the purchase of futures contracts in the gold and silver markets to cover the leverage contracts. Ideally, when a leverage contract was sold, FGS would then purchase a futures contract for a like amount of gold or silver. In this manner the company could be protected from fluctuations in the metals markets. The facts as presented to the jury, however, indicated that FGS was not fully hedged for most of the time that it conducted business. After FGS was seven months old its obligations to its customers were greater than the level of its coverage. By June of 1978 the deficit was approximately $7,000,000.[6] In August of 1978 Mount told Newham that FGS was broke and that he feared going to prison unless they received new money from sales. As the financial condition of FGS worsened, so did the working relationship of Mount and Newham. As a result of this friction Newham suggested to Kaminski that he would like to buy Mount's interest in FGS in order to get him out of the company. In January of 1979 Mount, through Kaminski, agreed to a sale of his interest for a price of $250,000. Newham paid $100,000 down out of FGS's own funds and agreed to make further payments on the balance.

In February of 1979, with Newham ostensibly in sole control of FGS, he hired George Fahr, an experienced salesman who was driving a taxicab at the time. Fahr came to Newham's attention through Kaminski, who encouraged Newham to hire

him. The last of the defendants, Jack Brownrigg, was hired as a salesman in April at the suggestion of Fahr. Soon after, Brownrigg was made sales manager, and Fahr was installed as general manager. These remaining defendants served in these positions up until the time of FGS's demise in September of 1979 as a result of investigations by state and federal authorities.

B. *Basis of Criminal Charges*

The indictment alleged that from January 1978 to September 1979 the defendants conspired to defraud customers of FGS and that they committed 14 acts of mail fraud in the process. The essence of the mail-fraud and conspiracy charges was that the defendants, either personally or through salesmen they hired, trained, and supervised, misled customers as to how FGS would protect the customers' investments. The defendants and their salesmen told customers that the leverage contracts were "covered" in one, if not both, of the following ways: (1) that FGS would go into the metals market and purchase the physical gold or silver, and then store it in a vault at the Shelard Bank for the customers,[7] or (2) that FGS would purchase a futures contract on a commodities exchange for the amount of the metal the customer had purchased. However, neither of these representations was true. The actual amount of gold or silver coins, or "physicals" as they were called, on hand at FGS was very small. Certainly the inventory of physicals represented an insignificant percentage of the company's obligations to its customers.

As for hedging or covering in the futures market, there was testimony by Lloyd Kadish, an attorney who represented FGS during the latter part of 1979, to the effect that hedging is a ministerial task that could be accomplished by a clerical employee. FGS needed only to place orders in the futures market on a daily basis as sales were made. In this manner a concern like

6. Tom Perpich, an accountant at FGS, testified that he quit his job at FGS in August 1979, just after he calculated that FGS's obligations to customers exceeded its accounts receivable by some $10,000,000.

7. Unlike other precious metals investment companies, FGS charged no storage fee.

FGS, properly managed, would have had no interest in the price level of gold or silver, and the entire risk of price fluctuations would be transferred to the customer. The profit to be made in such a business would come from commissions on sales and the interest that customers agreed to pay on the outstanding balance of their accounts.

FGS, of course, was not properly managed. From its very inception it was undercapitalized. As of February 4, 1977, $20,000 had been invested as capital by Mount, Ulrich, and Swalinkavich. Also on February 4, $5,000 was paid to Kaminski as a consulting fee. Then on March 1, $10,000 was paid to Central Coin Exchange, Ulrich's corporation, and on March 2, another $5,000 was paid to Kaminski as a consulting fee. Thus, within four months of the corporation's birth the initial capital was gone.[8] This scarcity of operating funds created an immediate cash-flow problem. Apparently Kaminski and Mount chose to solve the problem by using the funds from customer accounts to keep FGS afloat.

It appears that for the first six months of 1977 FGS's customer accounts were fully covered. But by August of 1977 the level of coverage was at a deficit of over $2,000,-000, and serious attempts to cover customer obligations fully ceased. From this time up until FGS was closed in September of 1979 the general approach to sales involved assurances to prospective clients that their investments were fully covered, though

they surely were not. And through this time FGS went deeper and deeper into debt through mismanagement and misapplication of company funds. From all indications those who had active accounts with FGS at the time of its closing lost their entire out-of-pocket investment, not to mention the enhanced value their investment would have had if FGS had handled their money properly and lived up to its commitments.

## II.

Before we discuss the specific arguments of each defendant it is appropriate to outline briefly the law of mail fraud. In order to sustain a charge of mail fraud under 18 U.S.C. § 1341 the government must prove (1) the existence of a scheme to defraud, and (2) the use of the mails for the purpose of executing the scheme.[9] *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). It is not necessary, however, that the government prove that a defendant personally mailed the letter or document that is the basis of the individual mail-fraud charge. It is enough that the defendant knowingly caused the mailing of such document. This can be shown by evidence that the defendant committed "an act with knowledge that the use of the mails [would] follow in the ordinary course of business, or where such use [could] be reasonably foreseen, even though not actually intended . . . ." *Pereira, supra,* 347 U.S. at 8–9, 74 S.Ct. at 362.[10] It also bears mention

---

**8.** Revenues from sales at this point were not substantial. According to the account book FGS did not make its first sale until February 11, 1977.

**9.** The text of § 1341 is as follows:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail mat-

ter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**10.** A defendant can also be convicted on the basis of an aiding and abetting theory. Aiding and abetting under 18 U.S.C. § 2 is not a separate offense, and it need not be specifically charged in the indictment. *United States v. Beardslee*, 609 F.2d 914, 919 (8th Cir. 1979), *cert. denied*, 444 U.S. 1090, 100 S.Ct. 1053, 62 L.Ed.2d 778 (1980).

that the term " 'scheme' connotes some degree of planning ..., and thus it must be proved that a defendant acted with the intent to defraud." *DeMier v. United States*, 616 F.2d 366, 369 (8th Cir. 1980). With this law in mind we now turn to the arguments urged by the individual defendants.

### III. Kenneth Kaminski

A. Kaminski first argues that the evidence before the jury was insufficient as a matter of law to sustain his conviction on either the mail-fraud counts or the conspiracy count. We, of course, have viewed the evidence contained in the record in the light most favorable to the prosecution and have deemed established any reasonable inferences consistent with the findings of guilt. See *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Moreover, "[t]he evidence need not 'exclude every reasonable hypothesis except that of guilt[; it is enough] that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty.'" *Durns v. United States*, 562 F.2d 542, 546 (8th Cir.) (quoting *United States v. Shahane*, 517 F.2d 1173, 1177 (8th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975)), *cert. denied*, 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977). Based on this review we conclude that all counts on which Kaminski was convicted should be affirmed except for count IX, a mail-fraud count. We first discuss the affirmed mail-fraud counts.

The evidence of a scheme to defraud was overwhelming. As we have already noted, within a few months of FGS's incorporation Kaminski had withdrawn much of its working capital by charging FGS for "consulting fees." Around the same time, March of 1977, Ulrich, one of the original parties to

the formation of FGS, grew dissatisfied and arranged to sell out his interest in the company (Tr. XII, 154–60).[11] By mid-summer of that same year Swalinkavich, the second of the three original investors, wanted out of FGS. He was told that FGS had cashflow problems and that there was not enough money available to buy his interest. He asked several times to see FGS's books but was never given the opportunity (Tr. XI, 124).

■ Next, a parade of government witnesses, customers of FGS, testified without contradiction to the misrepresentations put forth by Kaminski, Mount, and other employees of FGS. The basic sales pitch was that FGS would go into the market and buy the actual gold and silver in amounts equal to the customer's account. These purchases were to be "financed" by FGS, for which 8% interest per annum was charged. FGS represented that if physicals were not purchased, it would cover customer accounts through the purchase of futures contracts. The fact is, however, that for most of the life of FGS customer accounts were not fully covered by either method. Thus the very essence of FGS's way of doing business was fraudulent—it billed its product as a protected investment when just the opposite was true. In addition, when customers wanted to liquidate, they were always met with resistance from the sales force at FGS. For the most part when customers persisted, they were paid. However, they were not paid from the sale of their investment in the market, but were paid out of new customers' money. FGS customers were never told that robbing Peter to pay Paul was FGS's mode of operation.

Having proved the existence of a fraudulent scheme, the government need only prove that Kaminski caused the use of the mails for the purpose of executing the

---

11. Ulrich put in $10,000 of the original $20,000 used to start FGS in December of 1976. By the first part of March 1977, roughly three months later, he and Kaminski were not getting along, and he wanted out. For his interest he was given a check for $10,000 on March 3, 1977, and Kaminski and Mount agreed to pay him further $500 a month for 20 months.

Citations to the transcript of the trial will be referred to as "Tr." followed by a volume and page number, except for Newham's testimony, which is contained in separate volumes denoted as "N."

scheme. The five counts which we affirm as to Kaminski concern mailings taking place between January 9, 1978, and November 3, 1978.[12] There is no question that during this time he was actively participating in the fraudulent scheme. Although Kaminski was managing National Commodities at this time, he was also involved with the day-to-day operation at FGS. It is enough that Kaminski was still active in the scheme and that he knew, or could reasonably have foreseen, that the mailings would take place. But certainly there was sufficient evidence from which the jury could properly infer that the misrepresentations being made were at the direction of and with the authorization of Kaminski. And, use of the mails was an integral part of FGS's mode of operation. The mailings that are the basis of the counts in question here (except for count VII) are confirmations of sales by FGS mailed to the customer or payment checks mailed by the customer to FGS. Therefore, there can be no question that the mailings were for the purpose of executing the fraudulent scheme and that Kaminski knew the mailings would take place.

■ Kaminski makes a different argument as to count VII, which was based on the mailing of a letter from FGS to a customer, Alf Garnaas. The letter informed Garnaas that FGS had moved its offices and gave him the new address in Bloomington and the new phone numbers. Kaminski argues that this type of mailing is too unrelated to the execution of the scheme to be a sufficient basis for the charge of mail fraud. The change-of-address letter is said to be nothing more than a routine business mailing, intrinsically innocent, and thus too remote from the fraud. In support he cites the case of *United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977). In that case a phonographic record company shipped records to the customers of the defendants' company. Packing slips, listing the products shipped, were then mailed to the defendants. The fraudulent scheme involved the defendants' failure to enter all of the sales on their books. The court considered the packing slips to be routine business mailings and too remote from the fraudulent scheme to be the subject of mail-fraud charges.

The mailing in question here, though arguably routine in some sense, occupies a very different position relative to the fraudulent scheme. In *Tarnopol* the packing slips were evidence of the amount of the defendants' sales. The mailing of the slips, however, did nothing to further the fraudulent scheme—the concealment of the true level of sales. Our change-of-address letter, on the other hand, was mailed to one of the victims of the fraudulent scheme. It transmitted information that facilitated Garnaas's continued participation, as a victim, in the scheme. Its very purpose was to further the scheme, and as such, it was "sufficiently closely related to [defendant's] scheme to bring his conduct within the statute." *United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974).

■ We now turn to count XV, the conspiracy charge, on which only Kaminski and Mount were found guilty. The offense of conspiracy under 18 U.S.C. § 371 consists of an agreement between the conspirators to effect the object of the conspiracy, together with at least one overt act to carry it out. *United States v. Pelton*, 578 F.2d 701 (8th Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978). The agreement may be established by circumstantial evidence, as conspiracies seldom lend themselves to proof by direct evidence. *Ibid.* We find ample evidence to support the jury's finding of guilt on the conspiracy charge.

■ Kaminski and Mount ran FGS from the very beginning. They hired and trained the sales staff that helped carry out the fraudulent scheme. They both had intimate knowledge of the inner workings of FGS and its financial condition. For instance, in August of 1978 Mount told New-

12. Counts III, VI, VII, VIII, and XIII.

ham that FGS was virtually broke.[13] Yet for many months afterward the misrepresentations to customers continued with the knowledge and approval of Kaminski and Mount. Then in January of 1979, at a meeting between Kaminski, Mount, and Newham, FGS was sold to Newham for $250,000 to be paid for with funds from FGS,[14] despite the company's precarious financial condition. From this evidence and much more the jury could have inferred the existence of a conspiracy and the intentional participation therein of Kaminski and Mount.

■ As we noted earlier, we are unable to affirm Kaminski's conviction on count IX for mail fraud. The mailing in question was the payment to FGS from Gerald Ellis for the purchase of a quantity of gold coins on margin. The date of the mailing was July 7, 1979. What troubles us about this count is that the mailing took place many months after Kaminski's withdrawal from FGS in January of 1979, when the business was sold to Newham. The government concedes as much. Gov.Br. p. 16. The government theorizes, however, that Kaminski's prior contact with Ellis in November of 1978 somehow aided and abetted the other defendants some eight months later. We cannot agree.

Ellis contacted FGS in November of 1978 about the purchase of silver coins. He dealt with Dan Silkowski, an FGS salesman. Two cash purchases were consummated in the middle of November, and he received the coins as ordered. Then in the latter part of November he contacted Mr. Silkowski again about buying some Mexican pesos. Mr. Ellis was referred to Kaminski at this point, and the sale was made through the House of Crowns, a company owned by Kaminski. Confirmation of this cash sale came from Kaminski on House of Crowns letterhead. Mr. Ellis had no further contact with Kaminski, and it was not until eight months later that he called FGS and was persuaded to enter into a margin contract. Kaminski's sale through the House of Crowns in no way facilitated the later margin sale, which took place several months after Kaminski had withdrawn from FGS. The judgment as to count IX is reversed.[15]

■ B. Kaminski's next argument for reversal is that repeated instances of prosecutorial misconduct denied him a fair trial. As we have said, the trial was lengthy and complex. A defendant is entitled to a fair trial but not necessarily a perfect one. But of course there is a point at which prosecutorial misconduct, whether inadvertent or intentional, will have a sufficient impact to require reversal.

■ Kaminski alleges several instances of misconduct on the part of government counsel, Douglas A. Kelley. The one we find most troubling involves Kelley's cross-examination of defense witness Lloyd Kadish. Kadish, an attorney, represented FGS during the summer of 1979 when it was being investigated by the Minnesota Securities Commission. Kadish was called to the stand as a witness for Douglas Payne. During cross-examination Kelley asked him the following question:

> [MR. KELLEY]: Q. Isn't it also true that concerning your proposed testimony here, you strongly considered coming and taking the Fifth Amendment?

Tr. XX, 59. There was an immediate objection and a motion for a mistrial outside the presence of the jury. After a bench conference the objection was sustained, the motion for a mistrial was denied, and a cautionary instruction was given to the jury upon their return.

Kaminski argues that by posing the question Kelley implied that FGS's own attorney recognized that he, and, by inference,

---

**13.** Newham was a co-conspirator, but an unindicted one because of his plea arrangement with the government.

**14.** This sale involved the overt act in furtherance of the conspiracy charged to Mount.

**15.** There is no need for a remand for resentencing. The punishment imposed on count IX (5 years' imprisonment and $1,000 fine) was to be concurrent with a like sentence imposed on count III.

the company, might be involved in illegal activities, and that the impression of criminality thus left might have been transferred to the defendants.[16] There is no question that this was a completely improper form of impeachment. See *United States v. Williams*, 464 F.2d 927, 930 (8th Cir. 1972). The question is whether it was an error sufficiently prejudicial to require reversal.

The leading case is *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). There the Court examined the question of reversible error *vel non* by looking to the surrounding circumstances of the case with the primary focus "on two factors, each of which suggests a distinct ground for error." *Id.* at 186, 83 S.Ct. at 1154. First the Court recognized that reversible error may occur "when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Ibid.* It was also noted that a worse situation is presented when the government makes an additional reference to use of the privilege during closing argument. The first of these circumstances may be present here, but after a cautionary instruction was put to the jury, no further mention was made of Kadish's consideration of invoking the privilege.

The second factor discussed in *Namet* involves "the conclusion that, in the circumstances of a given case, inferences from a witness'[s] refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." 373 U.S. at 187, 83 S.Ct. at 1155. This situation is not present here. The evidence of Ka-

minski's guilt was more than substantial, if not overwhelming. The improper impeachment of Kadish was not crucial in any sense. And if the objectionable question was prejudicial, the instruction to the jury to disregard it sufficiently cured the error.[17] *Ibid.*

Kaminski points to several other alleged instances of prosecutorial misconduct.[18] We have examined the record and the corresponding arguments presented in his brief, and we conclude that no extended discussion of the allegations is necessary here. The incidents do not rise to the level of reversible error when viewed in light of the strength of the government's case, the length of the trial, and the trial court's timely corrective actions. See *Namet v. United States, supra*, 373 U.S. at 187, 83 S.Ct. at 1155.

C. Kaminski also contends that the District Court erred when it failed to grant his numerous motions for severance. He argues that severance was necessary because the complexity of the case prevented the jury from considering the evidence on each charge against each defendant.

"Severance is required when the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to the separate defendants." *United States v. Reeves*, 674 F.2d 739, 744 (8th Cir. 1982). Our scope of review on this issue is narrow. Denial of a motion for severance is not a basis for reversal unless the appellant can show that the denial resulted in clear prejudice and was an abuse of discretion on the part of the District Court. *United States v. Losing*, 560 F.2d

---

**16.** Kelley argued at trial that it was proper impeachment to show that Kadish had a bias in the lawsuit because he was concerned about his own conduct (Tr. XX, 65). At oral argument, however, Kelley wisely acknowledged his error and admitted there was no justification for the incident.

**17.** The *Namet* analysis was used again in *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). For a look at the various factors considered by lower courts in applying the two-part analysis of *Namet*, see

*Zeigler v. Callahan*, 659 F.2d 254, 272 (1st Cir. 1981).

**18.** The other allegations of misconduct involve the prosecutor's belated correction of false testimony given by Newham, the questioning of a witness about evidence previously ruled inadmissible, certain references to the defendants' failure to produce exculpatory evidence, certain misstatements of the facts and the applicable law, and the prosecutor's resistance to certain discovery orders.

906, 911 (8th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977).

▮▮▮▮ We begin by noting that as a general rule alleged co-conspirators should be tried together. *United States v. Singer*, 660 F.2d 1295, 1306 (8th Cir. 1981), *cert. denied*, 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982). Moreover, this case, because it also involves a single, ongoing scheme, lends itself to a logical compartmentalized analysis. It was not difficult for the jury to sort out the scope of each defendant's involvement throughout the life of FGS. Certainly this is so in Kaminski's case. He was involved with FGS from the very beginning up to the time he withdrew from the company in early 1979. For the most part, the jury's verdict as to Kaminski reflects this.[19] Nor can it be said that Kaminski's theories of defense were inconsistent with those of his co-defendants. For the most part they all attacked the credibility of Newham, the government's star witness, and tried to saddle him with the entire blame for the downfall of FGS. They also claimed that their actions were taken and their statements made in good faith with no intent to defraud. Apparently the jury did not believe these theories as to any of the defendants, and there is no indication that separate trials would have led to a different result.

Finally, Kaminski argues that a severance would have shielded him from an improper closing argument made by counsel for one of his co-defendants, in which a reference was made to the failure of any of the defendants to testify in their own behalf (Tr. XXIV, 85). The reference was made, however, only by way of making the point that no adverse inference should be drawn on that basis. Though this argument may have represented a minor difference in defense strategy, it certainly did not rise to the level of prejudice which would require severance. After all, a similar instruction was put to the jury by the trial court, and properly so. In sum, we find no clear prejudice or abuse of discretion in the District Court's denial of Kaminski's motions for severance.

D. This concludes our discussion of Kaminski's arguments on appeal. We are satisfied that he received a fair trial, and that the proof of guilt on each count we now affirm was more than sufficient. Accordingly the judgments of the District Court as to him on counts III, VI, VII, VIII, XIII, and XV are affirmed, and the judgment on count IX is reversed.

### IV. Stephen Mount

A. Mount contends that there was insufficient evidence to sustain his convictions on the seven mail-fraud charges and the one charge of conspiracy. We have reviewed the entire record, and it reeks of fraud. There was ample evidence to sustain five of the mail-fraud counts (counts III, VI, VII, VIII, and XIII) and the conspiracy count (count XV). On two of the mail-fraud counts we find the evidence lacking (counts IV and XII).

▮▮▮▮ Discussion of the mail-fraud convictions which we now affirm need not be extensive. They are the same five counts we affirmed as to Kaminski. There now can be no question that a scheme to defraud was in place. There is also no question of Mount's direct involvement. The five relevant mailings took place from January 1978 through November 1978. Mount was the President of FGS throughout this period. All sales, misrepresentations, and mailings were accomplished at his direction, and for the purpose of executing the fraudulent scheme. There is overwhelming evidence of his willing and knowing involvement in the scheme, and thus it can easily be said that he caused the above mailings.

---

**19.** We recognize that the jury's verdict on count IX is at odds with the timing of Kaminski's direct involvement in FGS. This verdict may reflect a misunderstanding on the part of the jury as to the kind of involvement on which an aiding-and-abetting theory can properly be constructed. This is not the type of jury confusion that a separate trial would have obviated, as the same evidence as to Kaminski on this count would have been presented to the jury even had he been tried alone.

Mount's conviction on the conspiracy charge merits no discussion beyond that contained in part II–A of this opinion applying to Kaminski. Count XV is affirmed.

We turn now to counts IV and XII. The relevant mailings took place on April 30, 1979, and June 13, 1979, several months after the January sale of Mount's interest in FGS. The government would have us affirm these counts on the basis of an aiding-and-abetting theory, just as it urged on count IX as to Kaminski. We recognize that the law of aiding and abetting has a broad application, but we conclude that it should not be applied here.

■■■ The theory of aiding and abetting is well entrenched in the law.

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." [20]

*Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949) (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.)). The record reveals, however, that Mount had left FGS at the time the crimes were committed. There is no direct evidence tying him to either one of the mailings.

Tom Perpich, an accountant at FGS and friend of Mount's, testified that neither Mount nor Kaminski came around the offices after FGS had been sold to Newham. (Tr. XIV, 96). Mount made phone calls to Perpich concerning the account FGS maintained at National Commodity Exchange, but he took no part in the operation of FGS. Perpich also testified about several checks written to Mount after January in amounts of $5,000 and $10,000. These were further payments on the sale of FGS from Newham to Mount. Other than a few discussions between Newham, Mount, and Kaminski about late payments, this is the extent of Mount's contact with FGS after January 1979.

We have also looked to see when FGS first contacted the customers involved with counts IV and XII. Finlay Matheson (count IV) first contacted Newham and Payne during an International Investment Seminar held on February 15–17, 1979, at the Omni Hotel in Miami, Florida (Tr. III, 55). Arthur Heth's (count XII) initial contact with FGS was by phone in early April 1979 (Tr. III, 25). So neither victim of these counts ever dealt with FGS at a time when Mount was still involved with its operation. In view of the above facts we cannot find the required affirmative acts on the part of Mount that encouraged the perpetrators of counts IV and XII. *United States v. Buttorff,* 572 F.2d 619, 623 (8th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978). Thus his conviction on counts IV and XII must be reversed.[21]

B. Mount's next argument for reversal is that it was plain error to allow an alternate juror to accompany the jury during its deliberations, and to be later substituted, despite the consent of all defendants. Just as the jury was excused to commence deliberations, and the remaining alternate was discharged, counsel for Payne approached the bench. He asked that the alternate be kept waiting in case one of the jurors became ill. Then another defendant's counsel suggested that the alternate join the deliberations at that point so she would be apprised of the jury's progress. An extended discussion ensued. It was decided that the alternate juror would sit in with the jury during its deliberations, but that she was not to speak or otherwise take part in the discussion. In the event a regular juror had to be excused, the alternate would then

---

**20.** As much is provided by 18 U.S.C. § 2(a), which reads:

> Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

**21.** Here again there is no need for a remand for resentencing. The punishment imposed on counts IV and XII (5 years' imprisonment and $1,000 fine on each) was to be concurrent with a like sentence imposed on count III.

be seated on the jury, which would have to reconsider any verdicts already reached. The jury was then recalled, the situation was explained by the court, and then the twelve-person jury with one alternate was excused to begin deliberations. The government showed caution but was amenable as long as all counsel for the defendants were in agreement. And each defendant gave his personal consent on the record.

On the third day of deliberations, Friday, December 5, 1980, the court was informed that one of the jurors had had a death in her family. She was excused at the end of deliberations on that day, and the alternate took her place on the twelve-member panel the following Monday. Once again all counsel were unanimous in their approval of this procedure. Over the course of the next week the jury continued to deliberate without incident. By Friday, December 12, all verdicts as to all defendants were returned, and the jury was dismissed.

■ Mount now argues that the presence of the alternate during deliberations amounts to plain error which requires reversal and a new trial. He offers cases from two circuits which adhere to this per se plain-error rule, *United States v. Beasley*, 464 F.2d 468 (10th Cir. 1972), and *United States v. Virginia Erection Corporation*, 335 F.2d 868 (4th Cir. 1964). See also *United States v. Chatman*, 584 F.2d 1358, 1361 (4th Cir. 1978). Other circuits, however, have shunned the per se rule by requiring reversal only where there is some showing of prejudice. See, e.g., *United States v. Allison*, 481 F.2d 468 (5th Cir. 1973), *aff'd after remand*, 487 F.2d 339 (5th Cir. 1973), *cert. denied*, 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 759 (1974); *United States v. Phillips*, 664 F.2d 971 (5th Cir. 1981); *United States v. Watson*, 669 F.2d 1374 (11th Cir. 1982); see also *Johnson v. Duckworth*, 650 F.2d 122 (7th Cir. 1981) (in state court, trial

alternate's presence during jury deliberations did not deny appellants a fair trial). We consider this to be the better rule.

■ We do not question that the procedure followed here was at odds with the Federal Rules of Criminal Procedure. Rule 23(b) provides for submission of a case to a jury of less than 12 only where all counsel and defendants agree in writing. Neither the Constitution nor the rules contemplate that a case may *ever* be submitted to a jury of more than 12. And Rule 24(c) states that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." These rules are mandatory. It does not necessarily follow, however, that any variance therefrom requires reversal.[22] This is especially so here, where the erroneous procedure was employed at the behest of defense counsel and even consented to by each defendant. The verdicts were returned without complaint, and no serious argument is made that prejudice occurred. We disapprove this procedure, but there has been no violation of substantial rights. On the specific facts presented here, the deviation from proper procedure was not so fundamental as to require reversal.

C. Mount's final arguments involve instances of claimed prosecutorial misconduct and the trial court's failure to grant his motions for severance. We reject these arguments for the reasons set forth in parts III–B and C of this opinion.

D. The record confirms that Mount received a fair trial and that there was sufficient evidence to support the judgment on counts III, VI, VII, VIII, XIII, and XV. Having rejected all other arguments for reversal we affirm as to these six counts, and reverse counts IV and XII for the reasons stated in part IV–A.

---

**22.** We find guidance in *Fallen v. United States*, 378 U.S. 139, 142, 84 S.Ct. 1689, 1691, 12 L.Ed.2d 760 (1964), where it was said that "the Rules are not, and were not intended to be, a rigid code to have an inflexible meaning irrespective of the circumstances." There may still be cases where deviation from normal procedure is so egregious that prejudice is presumed. This is not such a case. The alternate here was present in the jury room but took no part until the juror was excused. The alternate would have said nothing and not cast a vote had a juror not been excused.

## V. Douglas Payne

A. Douglas Payne was convicted on ten counts of mail fraud (Counts I, II, IV, V, VIII, IX, X, XI, XII, and XIV). The mailings that were the basis of these counts took place from November 3, 1978, up to the time FGS was closed in September 1979. Payne's first argument is that there was insufficient evidence. We disagree.

Payne came to work at FGS in January 1978 soon after his close friend, Richard Newham, joined the company. He immediately started serving as Director of Market Research. At this point the fraudulent scheme was in full swing. The question then becomes whether and when Payne began taking an active part in the scheme to defraud.

Newham testified that in the summer of 1978 Mount informed him that FGS was virtually broke. He further testified that he discussed the matter fully with Payne (N. I, 24). Payne was taking an active part in making sales to FGS customers. For instance, there was John Reedy, a customer first contacted by FGS in April 1978.[23] He was then called three or four more times by Payne before he was persuaded to invest with FGS (Tr. V, 146). Reedy made another purchase on October 31 of the same year through Payne (*id.* at 149). Soon thereafter gold prices dropped considerably. On November 17, Payne called Reedy and asked for some money to make a margin call. Reedy refused. After several other calls from various FGS people, such as Mount and Newham, Reedy was told that his account was being closed out and that he would be hearing from FGS's attorney. The call from the attorney never came.

This is damaging evidence as to Payne, for it demonstrates that at this point he was aware of the implications of using the margin call to force customers to close out their accounts. Newham testified that every time FGS salespeople made a margin call they were lying to the customer because they had not financed the balance of the contract for the purchase of physicals or otherwise covered the investment (N. I, 36). Moreover, closing out customer accounts, rather than meaning a loss to FGS, meant a gain to it because it decreased the level of obligations on contracts that were never fully covered.

Another aspect of Payne's role at FGS was argued to the jury during closing argument. As the Director of Market Research Payne's expertise was depended on when there was a big sale or when there was trouble with a customer's account. In other words, he was the one with the facts, figures, market statistics, and technical jargon that gave FGS an air of legitimacy. One such problem account was that of a Mr. Barnett from Seattle, Washington. At one point he became dissatisfied with the salesman handling his account. The salesman told him not to panic, that he would visit him in Seattle and would bring along an expert. The expert was Douglas Payne. Over lunch Payne brought out charts and graphs and talked at length about the metals market. He closed the meeting with a sales pitch he had used more than once. He told Barnett that he had some bags of silver that he had bought the week before. As a special favor he was willing to let Barnett buy them at the previous week's lower price. This meant a savings of several hundred dollars a bag. As a result Barnett ordered fifty bags of silver at a purchase price of $361,580 (Tr. XVIII, 108–09). Although he received a confirmation on the transaction, when FGS was closed down the next month Barnett learned that the purchase of the metals was never made.

This is not a full chronicle of the evidence relevant to Payne's involvement with the fraudulent dealings at FGS. It is enough, however, to demonstrate that Payne was intimately involved with the fraudulent scheme, and that his involvement predated the earliest mailings that were the basis of his convictions. Thus the jury's conclusion that Payne "caused" the ten mailings that

---

**23.** Lewis J. Weller testified that he contacted FGS in response to an ad in the *Wall Street Journal*, also in April of 1978. The FGS program—margin contracts supposedly backed up by physicals in possession of FGS—was explained to him by Kaminski, Mount, and Payne.

were the basis of his convictions, see *Pereira v. United States, supra,* and that he possessed the requisite intent to defraud, *DeMier v. United States, supra,* is amply supported by the record.[24]

▇ B. Payne, like the other defendants, complains that the instances of prosecutorial misconduct denied him his right to a fair trial. As discussed earlier (see part III–B, *ante*), we are troubled by the improper cross-examination of Lloyd Kadish. Kadish was called as a defense witness for Payne, and thus an argument can be made that the incident had a greater prejudicial impact as to him. We have considered this possibility but still conclude that under the *Namet* analysis Payne was not denied his right to a fair trial. His position vis-a-vis the other defendants is not sufficiently different to warrant a different result.

C. Payne's last contention is that the trial court erred when it did not grant his many motions for severance. Payne argues that he was prejudiced by the joint trial because much of the alleged misconduct took place prior to his employment with FGS, and, even after he was positioned there, he had minimal contact with the customers who testified. Payne's counsel also argued at trial that severance was necessary because of the different nature of involvement of defendants Payne, Fahr, and Brownrigg. Unlike Kaminski, Mount, and Newham, they were not part-owners of FGS at any time. Therefore, he argues, the jury could not separate the evidence applicable to the two groups of participants.

▇ There is some force to this argument as to Payne, as well as Fahr and Brownrigg. Separate trials, however, are not required just because the quantum of proof against each defendant is unequal, *United States v. Jackson,* 549 F.2d 517, 525 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 and 431 U.S. 923, 968,

97 S.Ct. 2195, 2968, 53 L.Ed.2d 236, 1064 (1977), or because each defendant did not participate in every act constituting the joined offenses. *Haggard v. United States,* 369 F.2d 968, 973 (8th Cir. 1966). Further, clear prejudice and an abuse of discretion must still be shown as grounds for reversal. *United States v. Losing, supra.* This standard has not been met here. The trial court made every effort to give cautionary instructions to the jury about the applicability of evidence to the various defendants. The consistency of the jury verdicts, viewed as a whole, demonstrates the jury's ability to compartmentalize the evidence as it related to each defendant. And our review of the record convinces us that the verdicts also demonstrate a considerable amount of caution as to the jury's findings of guilt. In sum, we find no clear prejudice or abuse of discretion on the part of the District Court.

D. In conclusion, we are satisfied that defendant Payne received a fair trial and that there was sufficient evidence to support his convictions. The judgments of the District Court as to Payne are affirmed.

## VI. George P. Fahr

▇ A. George Fahr was found guilty on nine counts of mail fraud (Counts I, II, IV, V, IX, X, XI, XII, and XIV). The alleged offenses took place from April 30, 1979, up to September 10, 1979, just prior to the closing of FGS. Fahr contends that there was insufficient evidence to sustain any of these convictions. We cannot agree.

George Fahr came to FGS in February of 1979. He was recommended to Newham by Kaminski as very knowledgeable about commodities markets. Although at the time he was hired he was working as a cab driver, he had 18 years' experience in the investment industry. The scheme to defraud was, of course, well under way at this

---

24. Payne, Fahr, and Brownrigg argue that their acquittal on the conspiracy charge bars a conviction on any of the underlying substantive counts of mail fraud or aiding and abetting mail fraud. The argument on the facts before us is without merit. Conspiracy and mail fraud are distinct offenses, with distinct proof necessary to a conviction on each. The jury here could have logically found evidence to support a finding of guilt on the mail-fraud charges, or aiding and abetting, while not finding sufficient proof of an agreement by Payne, Fahr, and Brownrigg, a necessary element of the conspiracy charge.

time. The question becomes whether and when Fahr became an active and knowing participant in the scheme.

In a statement to a postal inspector made after the closing of FGS, Fahr admitted that he learned of the dire financial condition of FGS in late March or early April, 1979. Indeed, almost everyone who worked for FGS at that time would have known as much. For in mid-March FGS's hedge account at National Commodities Exchange was closed out after FGS failed to meet a margin call. Newham was in Miami at the time,[25] and it was Fahr who dealt with Kaminski and Mount in an effort to assess the level of FGS's indebtedness to National. Fahr, after conferring with Kaminski and Mount, called Newham in Miami to tell him that FGS still owed $160,000 to National. Newham expressed surprise that they could owe that much money.

By April Fahr was training newly hired sales personnel at FGS. During this same period he was formally promoted to sales manager. He was also functioning as a salesman. He knew FGS was not covering its customers' investments either by obtaining futures contracts or by buying physicals. He nonetheless continued to make sales to customers. For instance, Paul DeLost testified that Fahr was his broker from March until the time FGS was closed. Fahr assured him that FGS covered investments by hedging in the futures market (Tr. XVIII, 213). In September, when Mr. DeLost visited the offices of FGS, he heard Fahr tell another customer over the phone that FGS was completely hedged and that FGS had millions of dollars behind it.

Newham also testified that after the hedge account was wiped out he and Fahr agreed that the only way to keep FGS operating was to go out and generate more sales. There was no change in the basic sales pitch that FGS would cover margin contracts by purchasing physicals or obtaining futures contracts.

In addition, Newham re-emphasized at this time that customers should be encouraged to keep their accounts fully leveraged. This was in the hope that prices would drop and FGS could close out the accounts of those unable to make their margin call. (This strategy was not new; see discussion in part V–A). This approach came easy for Fahr. His dealings with one John Page are a good example. Fahr began acting as his broker in April and continued to do so until FGS was closed. During this time the price of gold was on the rise, and consequently the equity in Page's account was growing. Page testified that it was his policy not to reinvest all of his equity, in order to protect himself if the market went down. Fahr assured him continually that he was being much too conservative (Tr. V, 218), and during the ensuing months he counseled him to make purchase after purchase from the equity in his account. In a legitimate business setting such pyramiding advice might have been proper. But here Fahr knew FGS was in no position to pay off Page's account. The equity purchases were encouraged only in order to keep Page in a vulnerable position. As it turned out, Page tried to liquidate his account in early September. He was stalled by Fahr, and the following Monday FGS was closed by federal authorities.[26] At this time the value of Page's account should have been in excess of $400,000.

Once again, this is not a full account of Fahr's activities at FGS. It is enough, however, to show that by early April 1979 he was an integral part of the fraudulent scheme. He was not a newcomer to the investment industry, he knew FGS was broke, and he knew customers were being misled. The jury's verdicts on the nine counts of mail fraud are amply supported by the record.

---

**25.** Newham and others were in Miami to recruit salesmen for the opening of an FGS branch in Florida.

**26.** Page's experience was not an isolated incident; it was the way FGS did business. Paul

DeLost testified that Fahr was his broker and that he had very frequent talks with him, until DeLost was ready to sell, when Fahr became scarce.

B. Fahr, like the other defendants, claims that it was error for the District Court to deny his motions for severance. As to the necessity of separate trials, Fahr makes the same arguments as those posited by defendant Payne. We reject those arguments for the reasons stated in part V–C, ante.

Fahr makes an additional argument concerning the denial of his severance motions which merits discussion. This argument involves the admission into evidence of testimony of a government witness concerning portions of a confession made by Fahr to a postal inspector.

A significant part of the statement was not admissible because it inculpated several of Fahr's co-defendants. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[27] Fahr complains that the omitted portions were exculpatory as to him, and therefore that he was prejudiced by the District Court's refusal to grant him a separate trial in which the entire statement would have been admissible.

■ This argument "emanates from the [general] principle that when a confession is introduced it is the defendant's right that all, and not just part of it, be produced." *United States v. Wenzel,* 311 F.2d 164, 168 (4th Cir. 1962). This rule, sometimes referred to as the rule of completeness, is well recognized in the law. Fed.R.Evid. 106; 1 *Weinstein's Evidence* ¶ 106[1] (1981); 7 Wigmore, *Evidence* § 2100 (Chadbourn rev. 1978). If the government insists on using the confession, severance is often required. 1 *Weinstein's, supra,* ¶ 106[1], 106–10. The rule of completeness is not without its exceptions, nor is it to be woodenly applied.

Where confessions by one defendant implicate other defendants, some courts have avoided problems raised by *Bruton* by admitting the statement in edited or "redacted" form with the references to co-defendants omitted. *United States v. Hernandez,* 608 F.2d 741, 748 (9th Cir. 1979); *United States v. Cleveland,* 590 F.2d 24 (1st Cir. 1978); *United States v. Holleman,* 575 F.2d 139 (7th Cir. 1978); *United States v. Muro,* 537 F.2d 1339 (5th Cir. 1976); *United States v. Wingate,* 520 F.2d 309 (2d Cir. 1975), cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). See also 1 *Weinstein's Evidence* ¶ 105[4], 105–27 (1981); 7 Wigmore § 2100(d) (Chadbourn rev. 1978). The rule of completeness is violated, and severance required, only where admission of the statement in its edited form distorts the meaning of the statement or excludes information substantially exculpatory of the declarant. See *United States v. Kershner,* 432 F.2d 1066, 1071 (5th Cir. 1970).

■ When redaction is employed as an alternative to severance to avoid the *Bruton* problem, an appellant is not relieved from showing prejudice to overturn on appeal the District Court's decision to continue with a joint trial. *United States v. Cleveland, supra,* 590 F.2d at 28; *United States v. Smolar,* 557 F.2d 13, 21 (1st Cir.), cert. denied, 434 U.S. 971, 98 S.Ct. 523, 54 L.Ed.2d 461 (1977). That showing has not been made here. Our reading of the omitted portion of Fahr's statement convinces us that, rather than being exculpatory, it actually corroborates the government's charge that Fahr was intimately involved with the operation of FGS and that he had total knowledge of what was going on.[28] There was no reversible error in the trial

---

**27.** Under *Bruton* it is unconstitutional to admit hearsay statements made by a co-defendant that implicate, but are inadmissible as to, another defendant.

**28.** The statement admitted at trial concerned Fahr's knowledge in March or April that FGS was not covering its investors' contracts. Along with numerous other references to the other defendants the trial court excluded the following sentence: "Upon finding this out (that contracts weren't covered) he immediately confronted Kaminski at National Commodi-

ties." Fahr's Brief at p. 10. Read in isolation, one could argue that this statement is somewhat exculpatory. Viewed in the context of all the government's evidence, however, it is very inculpatory. For after this time in March or April, Fahr continued to tell FGS customers that the contracts were fully covered. See part VI–A, ante. In June he told prospective FGS salesmen in Miami that FGS maintained a "seven or eight figure hedge account," Tr. VII, 121–22, when he knew full well that the hedge account had been wiped out in mid-March.

court's refusal to grant Fahr's severance motion. See *United States v. Hernandez, supra,* 608 F.2d at 749; *United States v. Kershner, supra,* 432 F.2d at 1071.

Fahr's last argument as to his severance motions concerns the alleged prejudice resulting from a reference made by Payne's counsel during closing argument about the defendants' failure to testify in their own behalf. This same argument was discussed and rejected in part III–C of this opinion, and we reject it here for the same reasons.

C. Fahr also makes arguments for reversal based on the alleged misconduct of the prosecutor and the presence of the alternate juror during jury deliberations. These arguments must fail for the reasons discussed in parts III–B and IV–B of this opinion.

D. There was ample evidence to sustain Fahr's convictions, and he received a fair trial. Accordingly, the District Court's judgments of guilty on counts I, II, IV, V, IX, X, XI, XII, and XIV are affirmed.

### VII.   John M. Brownrigg

A. Brownrigg's first argument for reversal concerns the evidence on which he was convicted. He contends that the evidence relative to the six counts of mail fraud on which he was found guilty was insufficient as a matter of law. We have examined the record of the trial and the arguments posited in his brief and have concluded that the argument must fail.

Brownrigg came to FGS the first week of April in 1979, as a friend of Fahr's. Although he was hired as a salesman, he had no previous experience in the precious-metals investment industry. He was trained by Fahr for two weeks in April, and, from all indications, he performed well almost immediately after that time. By late May or early June, on the recommendation of Fahr, he was promoted to sales manager. In this position Brownrigg trained and supervised the other sales personnel, and continued to make sales on his own.

It is important to note the time at which Brownrigg knew FGS was in trouble financially and that it was not covering its investors' contracts. Newham testified that he discussed FGS's financial woes with Brownrigg during the first two weeks of his employment (N. II, 103). A postal inspector testified that as of July 1979 Brownrigg knew that FGS customers' contracts were not covered (Tr. XIX, 51). The information came to Brownrigg at this time through Tom Perpich, an FGS accountant. Perpich was also said to have told Brownrigg that FGS needed at least $1,200,000 in order to cover customers' contracts. Brownrigg also admitted to the inspector that in spite of this knowledge he persisted in telling customers that their investments were covered and that he continued to instruct other salesmen to do so (Tr. XIX, 54).

Stanley Ainsworth was one such FGS customer who dealt with Brownrigg during this time. Brownrigg made sales to Ainsworth from May until the end of August. In their initial discussions Brownrigg assured Ainsworth that contracts like his were covered by FGS through the purchase of futures contracts (Tr. X, 40). Though Brownrigg continued to deal with him on almost a daily basis throughout the summer, he was never told a different story. Indeed, Brownrigg made several sales to Ainsworth in July, when, by his own admission, he knew that customer contracts were not covered (Tr. X, 50).

On this evidence alone a jury could conclude that Brownrigg was a knowing participant in the scheme to defraud as of July 31, 1979, the date of the earliest count on which he was convicted. There is also ample proof that he possessed the requisite intent to defraud. For it was Brownrigg who supervised the salesmen who made sales to customer after customer during the summer of 1979 based on assertions that their investments were fully covered. Brownrigg also had a direct role in discouraging those customers who wanted to sell out their account. He knew this to be the most direct threat to the continuation of the scheme, because he knew FGS could not meet its obligations. Brownrigg's role was testified to by a Miss Hess, who invested over $40,000 in FGS in August 1979. Her

broker was Charles Hodek. When she called on September 7 to sell out her holdings, Hodek referred her to Brownrigg. Brownrigg told her that her investment was in a "beautiful position" and that she was in "the safest [possible] thing at the time" (Tr. XVIII, 56). Assured by these remarks, she decided not to sell. The next week FGS was closed.

The above is but a brief account of Brownrigg's role at FGS. It is enough, however, to demonstrate the basis of the jury's finding of guilt on six counts of mail fraud from July 31 to September 10, 1979. There was ample evidence to support his convictions.

■ B. Brownrigg next argues that it was error for the District Court to deny his many motions for severance. In support he urges arguments identical to those made by defendant Payne. We reject those arguments for the reasons stated in part V–C, *ante.*

Brownrigg, like defendant Fahr, makes an additional argument on the severance issue that concerns admission of testimony about a statement he made to a postal inspector. All references to other defendants were ruled inadmissible under *Bruton v. United States, supra.* Brownrigg argues that the omitted references to the other defendants were exculpatory as to him, because they tended to show that the others were more knowledgeable than he about FGS hedging activities, that others were in actual control of the hedge accounts, and that he was not part of the upper level of the company.

The argument is unpersuasive. As we noted in part VI–B, *ante*, one must make a showing of prejudice to overturn on appeal a district court's decision to admit a defendant's statement in edited form in order to proceed with a joint trial. *United States v. Cleveland, supra.* The omitted references to the other defendants, even when viewed in the context of Brownrigg's argument, are at best exculpatory in an indirect sense only. One could always argue that more inculpatory evidence admitted as to co-defendants has the effect of minimizing one's own involvement. This possibility, however, falls far short of the showing of prejudice required for reversal of the trial court's decision.

C. Brownrigg's arguments for reversal involving alleged prosecutorial misconduct and the presence of an alternate juror during jury deliberations are identical to those rejected in parts III–B and IV–B, respectively. We reject them here for the same reasons.

D. After review of the entire record and consideration of the briefs of counsel, we are satisfied that defendant Brownrigg received a fair trial and that there was ample evidence presented to support his convictions. Accordingly, the judgments of guilty on counts I, II, V, IX, XI, and XIV as to Brownrigg are affirmed.

VIII.

The judgments of the District Court are affirmed, except as to the judgments against Kaminski on count IX and against Mount on counts IV and XII, which are reversed. As to these counts, the indictment is dismissed with prejudice. The sentences of all defendants remain intact.

It is so ordered.